IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RENEE LOVEJOY, | ) | Case No. 1:18-cv-514 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **<u>MEMORANDUM OF OPINION</u>** |
| | ) | **<u>AND ORDER</u>** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Renee Lovejoy, seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 14. Because the ALJ failed to apply proper legal standards in evaluating treating physician Dr. Joshua Sunshine's opinion and an opinion from Lake County Department of Job and Family Services ("LCDJFS"), the Commissioner's final decision denying Lovejoy's applications for disability insurance benefits and supplemental security income must be VACATED and the matter REMANDED for further proceedings consistent with this memorandum of opinion and order.

## II.     Procedural History

On April 21, 2015, Lovejoy applied for supplemental security income and disability insurance benefits.  (Tr. 35, 73, 89, 230–37).  Lovejoy alleged that she became disabled on June 15, 2010, due to epilepsy, depression, and anxiety.  ECF Docs. 15 and 16, Page ID# 766, 782; (Tr. 73, 89, 231).  The Social Security Administration denied Lovejoy's applications initially and upon reconsideration.  (Tr. 73–137).  Lovejoy requested an administrative hearing.  (Tr. 168–70).  Administrative Law Judge ("ALJ") Eric Westley heard Lovejoy's case on March 29, 2017, and denied the claim in a June 20, 2017, decision.  (Tr. 35–46, 51–72).  On February 6, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–6).  On March 6, 2018, Lovejoy filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.     Personal, Educational and Vocational Evidence

Lovejoy was born on March 15, 1974, and she was 36 years old on the alleged onset date. (Tr. 58, 231).  Lovejoy had a high school education, and completed two years of nursing school without obtaining a degree or certificate.  ECF Doc. 15, Page ID# 766; (Tr. 58).  She had previous work as cleaner/housekeeper.  ECF Doc. 15, Page ID# 766; (Tr. 254).

### B.     Relevant Medical Evidence

On March 29, 2010, Lovejoy was admitted to Lake Health Hospital after she had a seizure and became unconscious for five minutes.  (Tr. 320, 334).  When she regained consciousness, Lovejoy told the attending physician that she had a history of seizures, but had not taken her medication in two days.  (Tr. 329, 334).  An EKG and CT of Lovejoy's head was unremarkable, and other tests indicated that she had low potassium.  (Tr. 334).  Lovejoy was

treated with Topamax and potassium, and she was discharged from the emergency room in a stable condition.  (Tr. 326, 334).

On May 16, 2011, Lovejoy was again admitted to Lake Health Hospital after she had a seizure, and she was found unresponsive and bleeding from the mouth.  (Tr. 457, 471, 486). Lovejoy had a brain CT, which was unremarkable.  (Tr. 415, 469).  Abdulmuhssen Alistwani, M.D., noted that Lovejoy had acidosis and recommended that she stop taking Topamax because it might have caused her acidosis.  (Tr. 458–59).  Neurologist Joshua Sunshine, M.D., continued Lovejoy's Topamax prescription, and added Keppra to her prescription regimen.  (Tr. 460). Lovejoy was also evaluated for anxiety, and she told nurse Patricia Grippi that she took Percocet and Xanax to control her anxiety.  (Tr. 464).  Lovejoy told Grippi that she believed her seizure was caused by her physician's refusal to renew her Xanax prescription, and she denied having any depression.  (Tr. 464).  Lovejoy was discharged in a stable condition on May 18, 2011. (Tr. 486).  At discharge, Lovejoy told Galina Glovatskaya, M.D., that she had been taking a lower dose of Topamax because she was running out and could not get an appointment with her neurologist to renew her prescription.  (Tr. 486).

On July 15, 2011, Lovejoy told Dr. Sunshine that she did not have any seizures since her May admission, but she had blurry left eye vision and was concerned about her tuberous sclerosis.  (Tr. 540).  Dr. Sunshine noted that Lovejoy tolerated her Keppra and Topamax well. (Tr. 540–41).  On examination, Lovejoy: (1) was alert and oriented; (2) was in no acute distress; (3) had normal cortical functions, speech, muscle tone, extremity strength, senses, gait, and coordination; (4) had intact motor function, without asymmetry, weakness, tremors, or involuntary movements; (5) had symmetric reflexes; and (6) had absent cerebellar signs. (Tr. 541).  Dr. Sunshine continued Lovejoy's prescriptions and continued her restriction from driving pending an MRI.  (Tr. 541).

On February 13, 2012, Lovejoy told Dr. Sunshine that she had seizures since May, excessive urination, blurry vision, and memory problems. (Tr. 543). Lovejoy said she needed Dr. Sunshine to state that she was unemployable on a form, so she could get money to pay for her medications. (Tr. 543). Lovejoy denied having any depression or anxiety. (Tr. 543). Dr. Sunshine's examination findings remained the same, and stated that Lovejoy's last seizure was in May 2011. (Tr. 544). Dr. Sunshine stated, "I believe that [Lovejoy] will be employable in the future. She will return in three months [for] me to reassess and fill out another form for her which will[ ]say that [she] is empl[o]yable." (Tr. 544).

On September 17, 2013, Lovejoy told Dr. Sunshine that she had a generalized seizure the week before, wet her bed, occasionally saw dark spots, and sometimes felt the urge to urinate. (Tr. 546). Lovejoy again denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 546–47). Dr. Sunshine noted that Lovejoy had trouble with her Topamax, and he increased her Keppra prescription. (Tr. 546–47). He also recommend a DigiTrace EEG to monitor Lovejoy for intermittent seizures. (Tr. 547).

On October 4, 2013, Lovejoy began a seven-day ambulatory DigiTrace EEG test. (Tr. 625). Lovejoy told K. Smith, M.D., that she had daily epileptic episodes that began in 2007, which lasted "seconds to minutes." (Tr. 625). Lovejoy said that she did not have recollection of her epileptic events, but they made her tired, nauseous, and have headaches. (Tr. 625). The test results were normal, with no epileptiform discharges, EEG seizures, or lateralizing signs. (Tr. 625).

On November 27, 2013, Lovejoy told Dr. Sunshine that she had no more seizures or incontinence but complained that her Keppra caused weight gain. (Tr. 549). Lovejoy again denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 549–50). Dr. Sunshine noted that Lovejoy was "[s]table from an epilepsy

standpoint." (Tr. 550). He noted that Lovejoy wanted to cancel her Keppra prescription, and that her driving would have to be restricted until stability with her new medication was confirmed. (Tr. 550). Nevertheless, Dr. Sunshine continued Lovejoy's Keppra prescription. (Tr. 550).

On December 11, 2013, Lovejoy told Kristen Smith, M.D., that she had a seizure "about a month" earlier and another seizure two to three months before that. (Tr. 552). Lovejoy said that she had visual aura episodes, fell out of bed, and involuntarily urinated. (Tr. 552). Lovejoy also complained that she gained weight from her Keppra. (Tr. 552). Lovejoy denied having any depression or anxiety, and Dr. Smith's examination findings were the same as Dr. Sunshine's prior examination findings. (Tr. 552–53). Dr. Smith noted that Lovejoy's epilepsy was difficult to control, and that she "[m]ay consider referral for epilepsy surgery in the future." (Tr. 553). Dr. Smith adjusted Lovejoy's medications. (Tr. 553).

On January 17, 2014, Lovejoy told Dr. Sunshine that she was doing well on her medication, but that she had "some" headaches in the previous week. (Tr. 555). Lovejoy denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 555–56). Dr. Sunshine noted that he would reduce Lovejoy's Keppra prescription as soon as she was stable on her new medication. (Tr. 556). Dr. Sunshine adjusted Lovejoy's medications in March 17, 2014, after she complained that her medication gave her a rash. (Tr. 557–58).

On January 20, 2015, Lovejoy told Dr. Sunshine that she had two seizures in the previous month when her daughter had a baby and her son had open heart surgery. (Tr. 560). She stated that she did not take her medication, and she did not go to the hospital for her seizures. (Tr. 560). Lovejoy again denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 560–61). Dr. Sunshine stated that Lovejoy's

breakthrough seizure was likely secondary to noncompliance and getting out of routine. (Tr. 561).

On October 16, 2015, Lovejoy told Dr. Sunshine that she had seizures with altered awareness once per week. (Tr. 570). Lovejoy again denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 570–71). Dr. Sunshine increased Lovejoy's medications and continued her driving restriction. (Tr. 572).

On July 12, 2016, Lovejoy told Dr. Sunshine that she had blurriness in her left eye, excessive urination, seizures, and problems with memory and thinking. (Tr. 698–99). On August 1, 2016, Lovejoy told Dr. Sunshine that she had "learned to deal with" her epilepsy. (Tr. 694). She said that she had some breakthrough seizures and memory problems. (Tr. 694). Lovejoy again denied having any depression or anxiety, and Dr. Sunshine's examination findings remained the same. (Tr. 694–95). Dr. Sunshine did not make any changes to Lovejoy's medications in July or August 2016. (Tr. 699, 696).

## C. Relevant Opinion Evidence

### 1. Treating Physician—Joshua Sunshine, M.D.

On January 17, 2014, Dr. Sunshine completed an abilities assessment for Lake County Department of Job & Family Services. (Tr. 688–89). Dr. Sunshine stated that Lovejoy had epilepsy with an "unforeseen" to "lifetime" number of months' prognosis, and that she could not drive. (Tr. 688). He indicated that Lovejoy could carry out instructions and interact with the general public; however, she could not sustain an ordinary routine or perform activities within a schedule. (Tr. 688). Dr. Sunshine indicated that Lovejoy was not released for full-time or part-time employment, training, or basic hands on stationary work. (Tr. 688). On January 20, 2015, and December 1, 2015, Dr. Sunshine completed forms, stating that: (1) Lovejoy's epilepsy was

expected to last for 12 or more months; and (2) he believed Lovejoy was unemployable. (Tr. 684–87).

### 2. LCDJFS Opinion

An abilities assessment form from LCDJFS, dated October 29, 2012, shows that "J. Bro C/O CCF" stated that Lovejoy was "100% disabled." (Tr. 690). The form indicates that Lovejoy could carry out instructions and interact with the general public, but could not perform activities within a schedule or sustain an ordinary routine. (Tr. 690). The form also indicated that Lovejoy was not released for full-time or part-time work, training, or basic hands on stationary work. (Tr. 690). Further, the form indicated that Lovejoy would see a neurosurgeon, orthopedic surgeon, and a chronic pain management doctor. (Tr. 691).

### 3. Examining Psychologist—Richard Halas, M.A.

On July 29, 2015, consultative psychologist Richard Halas, M.A., examined Lovejoy on referral from the Division of Disability Determination. (Tr. 564–69). Lovejoy told Halas that she was a high school dropout, and that she had dropped out of a college nursing program when her mother and sister were murdered. (Tr. 564–65). She told Halas that she was treated for depression after her most recent seizure, but she denied any additional mental health treatment. (Tr. 565). She stated that she most recently worked for her own cleaning company, but she was forced to terminate her company after one of her customers found her passed out. (Tr. 565). She also worked for a day care and a pizza restaurant. (Tr. 565). She stated that she woke up at 6:30 am most days, washed, made coffee, shared household chores with her sons, stopped going to church due to anxiety and seizures, watched TV and movies, had no friends due to staying at home, read magazines, cooked, and liked to go bowling, to the pool, and to the library. (Tr. 567).

On examination, Halas found that Lovejoy was cooperative, appropriately motivated, and more dependent than independent. (Tr. 566). Lovejoy had a flat, tentative, and tearful presentation, and she sobbed when discussing her sister's and mother's murders. (Tr. 566). She said she was depressed due to her sister's and mother's murders, her inability to work, and her failure to follow through with becoming a nurse. (Tr. 566). Lovejoy had slow and constricted speech, no articulation errors, slow and constricted cadence, specific and goal-oriented responses, no thought fragmentation, no speech poverty, no response preservation, no idea flight, and above average response coherency and relevancy. (Tr. 566). Lovejoy had poor eye contact, depressed mannerisms, fluctuating appetite, sleep difficulties, flat affect, depressed mood, poor energy level, and feelings of inadequacy, hopelessness, helplessness, and worthlessness. (Tr. 566). Lovejoy had moderate anxiety levels, and her hands trembled. (Tr. 566). She had below average short-term memory, was completely oriented, had concrete thought, could concentrate and recall five digits forwards, understood proverbs, and had average or above average cognitive levels. (Tr. 567). Lovejoy's insight and judgment were good. (Tr. 567).

Halas diagnosed Lovejoy on Axis I with DSM IV 296.30 (major depressive disorder, recurrent type) and DSM IV 300.0 (anxiety disorder, not otherwise specified), psychosocial stress, and seizures, and he gave her a GAF score of 45. (Tr. 568). He stated that Lovejoy's symptoms were consistent with depression and anxiety. (Tr. 568). Halas opined that Lovejoy would have: (1) little or no difficulty in understanding, remembering, and carrying out instructions; (2) some problems with maintaining attention, concentration, persistence, and pace to perform simple and multi-step tasks, due to her short term memory problems even though her concentration was good; (3) severe problems with responding appropriately to supervision and coworkers in a work setting, due to psychosocial anxiety, constant tears, flat affect, and hyperventilation; (4) severe problems with responding appropriately to work pressures in a work

setting, due to anxiety; and (5) an appropriate, practical, and realistic ability to manage funds if her claim was granted.  (Tr. 569).

### 4.  State Agency Consultants

On June 18, 2015, state agency consultant Leon Hughes, M.D., evaluated Lovejoy's physical abilities based on a review of her medical records.  (Tr. 82–84, 98–100).  Dr. Hughes opined that Lovejoy could occasionally lift or carry up to 50 pounds, frequently lift or carry up to 25 pounds, stand or walk up to 6 hours in an 8-hour workday, and sit up to 6 hours in an 8-hour workday.  (Tr. 82, 98–99).  Lovejoy was unlimited in her ability to push, pull, balance, stoop, kneel, crouch, and crawl.  (Tr. 82–83, 99).  She could occasionally climb ramps/stairs, but she could never climb ladders, ropes, or scaffolds.  (Tr. 83, 99).  She needed to avoid all hazards, including unprotected heights and commercial driving, but she was unlimited in her ability to tolerate extreme heat, extreme cold, wetness, humidity, noise, vibrations, fumes, odors, dusts, gasses, and poor ventilation.  (Tr. 83–84, 99–100).  On December 2, 2015, Linda Hall, M.D., concurred with Dr. Hughes' opinion.  (Tr. 115–16, 129–30).

On September 15, 2015, state agency consultant Irma Johnston, Psy.D., evaluated Lovejoy's mental abilities based on a review of her medical records.  (Tr. 84–86, 100–02).  Dr. Johnston determined that Lovejoy was not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 84–86, 100–02).  Lovejoy was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain

attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 83–86, 101–02). On December 4, 2015, Audrey Todd, Ph.D., concurred with Dr. Johnston's opinion. (Tr. 117–19, 131–33).

### 5. Third Party Function Report

On September 3, 2015, Lovejoy's sister, Dawn Calic, completed a third-party function report. (Tr. 264–71). Calic stated that Lovejoy had unpredictable seizures. (Tr. 264). She stated that Lovejoy did "normal routine activities," including cooking, cleaning, taking care of her 12-year-old son, maintaining her personal care, and doing laundry. (Tr. 265–66). Calic stated that she helped Lovejoy take care of her son when she had seizures, and that Lovejoy was "unable to work and unable to drive." (Tr. 265). She said that Lovejoy walked or rode in a car outside daily, and she shopped for groceries or household items every week. (Tr. 267). Lovejoy's hobbies included reading, watching TV, and walking. (Tr. 268). Lovejoy saw friends occasionally, but she did not participate in any regular social activities. (Tr. 268). Calic stated that Lovejoy had problems with memory, completing tasks, concentration, and following instructions. (Tr. 269). Lovejoy did not have any difficulty following written instructions, but needed "some reminders occasionally" in order to follow spoken instructions. (Tr. 269). Lovejoy did not have any problems with authority figures, but she had some difficulty with dealing with stressful situations and adjusting to being able to work and drive. (Tr. 270).

### D. Relevant Testimonial Evidence

Lovejoy testified at the ALJ hearing. (Tr. 58–68). Lovejoy testified that she had two years of nursing school, but did not obtain a degree or certificate. (Tr. 58). She stated that she lived with her dad, stepmom, and 14-year-old son. (Tr. 59). She did not drive because she was "not allowed to" since 2010. (Tr. 66). Lovejoy never left the house alone, and she was never left alone at home for long periods. (Tr. 67). Her daughter helped her shower and do chores on days after she had seizures, because she felt sore, foggy, and nauseous. (Tr. 67–68). She was afraid to be alone with her grandchildren for more than an hour, because she did not want them to see her have a seizure. (Tr. 64, 66). Lovejoy testified that she last worked for her own cleaning company in 2010. (Tr. 59). She stated that her job ended because her seizures got worse. (Tr. 59).

She stated that her seizures typically occurred unexpectedly, and after she saw "auras." (Tr. 59–60, 63). They usually occurred when she was awake. (Tr. 60). If she had them while sleeping, she would wake up having urinated herself. (Tr. 60, 63). During her seizures, Lovejoy could hear what was happening around her, but it was "like a fog." (Tr. 60). She lost control of her body during convulsive seizures, and had fallen into a dresser on one occasion and knocked out teeth on another occasion. (Tr. 60). She stated that her son found her with blood coming out of her mouth during one seizure. (Tr. 60). After her seizures, she felt sore, foggy, and sick to her stomach. (Tr. 60). She last had a seizure the Thursday before the hearing, and it lasted for "just a few minutes." (Tr. 61). She had frequent focal seizures, during which she was in a fog and could hear things like a muffled drum; however, she could not respond to anything. (Tr. 61). Lovejoy said that she was last hospitalized for a seizure in 2010, and that she took medications to control her seizures. (Tr. 62). Her medications helped, but she said that her doctor wanted to wean her off Topamax because caused memory problems and bruising. (Tr. 62). Lovejoy stated

that Dr. Sunshine did not give her timeframe for when she could go back to work or have better memory. (Tr. 63).

Lovejoy stated that she also had "really bad bouts of . . . anxiety," for which she started to see a therapist. (Tr. 63–64). She said that she had anxiety attacks after her mother and sister were killed. (Tr. 64). Lovejoy was okay for a while, but she began to have panic attacks "out of nowhere." (Tr. 64). If she was in a store when she had her panic attack, she had to leave. (Tr. 64). She would forget things like shutting off the oven when she was cooking. (Tr. 64). She also could not spell or help her son with his homework. (Tr. 64). Lovejoy said that her counselor was going to put her on "some type of medicine," and that her initial evaluation the day before the hearing indicated that she had "some post traumatic stress." (Tr. 65). Lovejoy stated that she was not functioning, could not "handle situations," and did not know if her depression and anxiety was related to her seizures. (Tr. 65).

Gail Kleir, a vocational expert ("VE"), also testified at the hearing. (Tr. 68–71). The ALJ asked the VE whether a hypothetical individual with Lovejoy's age, education, and prior work experience could work, if she could perform medium work, except that:

> They can occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds. They must avoid all exposure to hazards, such as unprotected heights, machinery, commercial driving, who can perform simple tasks in a setting where changes are explained, can perform goal-oriented work, but cannot work at a production rate pace and can occasionally interact with supervisors, coworkers, and the public, but that interaction is limited to speaking and signaling.

(Tr. 69–70). The VE testified that such an individual could perform Lovejoy's prior work as a cleaner/housekeeper as normally performed and described in the *Dictionary of Occupational Titles*. (Tr. 70). The hypothetical individual could not perform Lovejoy's prior work as she had performed it, because doing so would require the hypothetical individual to take care of bookkeeping and other business operations. (Tr. 70). The VE stated that such an individual could also work as a cleaner II, laundry worker I, and linen room attendant. (Tr. 70–71).

The ALJ asked the VE if the hypothetical individual described above could work, if she would also be off task 20% of the time. (Tr. 71). The VE testified that such an individual could not work, because only 10% of off-task time would be tolerated. (Tr. 71). Further, the VE testified that a hypothetical individual could not work if she were absent twice a month, because that was beyond the acceptable absenteeism rate. (Tr. 71).

## IV.    The ALJ's Decision

The June 20, 2017, ALJ decision found that Lovejoy was not disabled and denied her applications for supplemental security income and disability insurance benefits. (Tr. 35–46). The ALJ determined that Lovejoy had not engaged in substantial gainful activity since June 15, 2010. (Tr. 37). The ALJ found that Lovejoy had "the following severe impairments: epilepsy, major depressive disorder, and anxiety disorder." (Tr. 37). The ALJ determined that Lovejoy had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 38). The ALJ determined that Lovejoy had the RFC to perform medium work, with limitations:

> occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can perform simple tasks in a setting where changes are explained; can perform goal-oriented work, but cannot work at a production rate pace; can occasionally interact with supervisors, coworkers, and the public if that interaction is limited to speaking and signaling.

(Tr. 40).

In assessing Lovejoy's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 40). The ALJ stated that he gave great weight to the state agency consultants' opinions, because they were highly trained experts who had familiarity with disability determinations and their opinions were consistent with the objective medical evidence. (Tr. 42–43). Such evidence included findings that Lovejoy had been found upon examination to be:

alert and oriented . . . , no acute distress, normal speech, normal cortical functions, normal sensory exam, normal strength in all extremities, normal reflexes, finger to nose normal bilaterally, no ataxia, no tremors, negative Romberg, and normal gait. . . . minimal treatment for her mental health condition and having mostly unremarkable mental status evaluations, such as being alert and oriented . . . , with goal-directed thought process, normal speech, adequate long term memory, good insight, good judgment, and no indication of hallucinations, delusions, or suicidal thoughts.

(Tr. 42–43). The ALJ gave partial weight to Halas' opinion. (Tr. 43). The ALJ noted that Halas was a highly trained mental health provider and had personally examined Lovejoy. (Tr. 43). Nevertheless, the ALJ found that Halas' opinion was not supported by Lovejoy's minimal mental health treatment and the mostly unremarkable mental evaluation findings in the record. (Tr. 43). Further, the ALJ stated that Lovejoy's GAF score of 45 was due little weight, because GAF scores are just a snapshot of functioning at a given time and it was inconsistent with Lovejoy's daily activities. (Tr. 43). The ALJ also stated that he gave little weight to Dr. Sunshine's opinion—that Lovejoy would be employable in the future—and the [LCDJFS] opinion—that Lovejoy was "100% disabled and no driving." (Tr. 43). The ALJ explained that "their opinions infringe on a matter reserved for the Commissioner, whether the claimant is disabled." (Tr. 43). Further, the ALJ stated that "their opinions are not consistent with the record." (Tr. 43–44). The ALJ also gave partial weight to Calic's third party statements, because Calic was not a medical provider with credential s to offer an acceptable opinion. (Tr. 43).

The ALJ found that, in light Lovejoy's RFC, age, and experience, Lovejoy was able to perform her past work as a cleaner/housekeeper. (Tr. 44–45). Based on his findings, the ALJ determined that Lovejoy was not disabled from June 15, 2010, through the date of his decision and denied Lovejoy's applications for supplemental security income and disability insurance benefits. (Tr. 46).

## V.    Law & Analysis

### A.    Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence.  42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence.  *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or

combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P;

(4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if

not, whether, based on the claimant's age, education, and work experience, she can perform

other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and

416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  The

claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled

and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B.  Treating Physician's Opinion

Lovejoy argues that the ALJ erred in giving little weight to treating physician

Dr. Sunshine's opinion.  ECF Doc. 15, Page ID# 773–77.  Lovejoy asserts that the ALJ "wholly

ignor[ed Dr. Sunshine's] opinion, . . . incorrectly attributed the opinion to the [LCDJFS,] and did

not address the limitations addressed therein."  *Id.* at 776.  Further, Lovejoy contends that the

ALJ did not treat Dr. Sunshine as a treating physician, or adequately consider the regulatory

factors in weighing Dr. Sunshine's opinion.  *Id.* at 776.  Finally, Lovejoy argues that the ALJ did

not provide any sufficiently specific reasons for rejecting Dr. Sunshine's opinion.  *Id.* at 776–77.

The Commissioner responds that any error in failing to recognize Dr. Sunshine as a

treating physician and author of the abilities assessment was harmless, because the ALJ provided

good reasons for discrediting the opinion.  ECF Doc. 16, Page ID# 793–95.  The Commissioner

asserts that the ALJ satisfied the regulatory requirement to give good reasons for rejecting a

treating physician's opinion, when the ALJ explained that Dr. Sunshine's opinion was

inconsistent with his own treatment notes.  *Id.* at 794–95.

At Step Four, an ALJ must weigh every medical opinion that the Social Security

Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ must give a treating

physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting

that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (Quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons

for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work."  20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2).

An ALJ's error is harmless if, absent the error, he would have applied the same procedure and reached the same conclusion.  *See Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792 *7 (6th Cir. Sept. 16, 1993) (unpublished) (reviewing whether the Appeals Council's erroneous rationale for finding that a rent reduction was unearned income for harmless error); *cf. Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that, even if an ALJ's adverse credibility determination is based partially on invalid reasons, the error is harmless so long as substantial evidence supports the ALJ's conclusion).  An ALJ's error is not harmless when the ALJ's failure to follow the regulations prejudices the claimant on the merits or deprives him of a substantial right.  *See Bowen,* 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Here, the ALJ failed to apply proper legal procedures in evaluating Dr. Sunshine's and the LCDJFS opinions.  First, the ALJ *did not* err by attributing to the LCDJFS the opinion that

Lovejoy was "100% disabled," as the opinion form does not clearly indicate what physician completed that opinion. (Tr. 690–91) (signed "J. Bro C/O CCF"). The ALJ also *did not* err in concluding that the LCDJFS opinion – that Lovejoy was "100% disabled" – and Dr. Sunshine's opinion – that Lovejoy would be employable in the future – infringed on the ultimate issue of whether Lovejoy was disabled or unable to work, which are matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d), 416.927(d).

Nevertheless, the ALJ erred in evaluating Dr. Sunshine's and the LCDJFS opinions because he did not evaluate, much less acknowledge, their statements regarding Lovejoy's abilities to carry out instructions, interact with the general public, sustain an ordinary routine, or perform activities within a schedule. 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 43–44, 688, 690). Furthermore, the ALJ's additional statements that Dr. Sunshine's and the LCDJFS opinions were due little weight because they were inconsistent with the record evidence[1] does not render harmless the ALJ's failure to follow Social Security regulations in evaluating Dr. Sunshine's and the LCDJFS opinions, because nothing in the ALJ's analysis is sufficiently specific to make clear to a subsequent reviewer the weight given to their opinions regarding Lovejoy's functional limitations. *Gayheart*, 710 f.3d at 376; *Cole*, 661 F.3d at 938; *Bowen*, 478 F.3d at 746; (Tr. 43–44). Accordingly, because the ALJ failed to follow the regulations and adequately explain the weight given to Dr. Sunshine's and the LCDJFS opinions regarding Lovejoy's functional limitations, remand is appropriate. *Cole*, 661 F.3d at 939.

---

[1] This court finds the supposed inconsistency dubious at best. None of Lovejoy's medical records indicated she experienced a grand mal seizure in the presence of a health care provider. Nevertheless, the ALJ accepts that Lovejoy has the severe impairment of epilepsy. It should be obvious that having benign symptomology on days when an epileptic patient is *not* having a seizure says *nothing* about what those same symptoms might be during or immediately after a seizure. The ALJ's citation of a tiny handful of records to support his "inconsistency" opinion was inadequate. And the ALJ's RFC finding does not appear to account for how much time Lovejoy might miss from work due to epileptic seizures on a monthly basis or whether, given such limitations, Lovejoy could sustain gainful activity in an employment setting.

### C. Consultative Examiner's Opinion

Lovejoy argues that the ALJ erred in giving only partial weight to examining psychologist Halas' opinion. ECF Doc. 15, Page ID# 777–78. Lovejoy asserts that the ALJ incorrectly found that Halas' opinion was not supported by the objective medical findings in the record, because Halas' own examination findings supported his opinion. *Id.* Further, Lovejoy contends that Halas' opinion was consistent with Dr. Sunshine's treatment notes, Calic's third party statement, and Lovejoy's testimony. *Id.* at 778. Finally, Lovejoy argues that the ALJ did not point to any reason for discrediting Halas' opinion in favor of the non-reviewing state agency consultants' opinions. *Id.*

The Commissioner responds that the ALJ properly found that Halas' opinion was due little weight, because his examination did not support the severe limitations in his opinion. ECF Doc. 16, Page ID# 795. The Commissioner argues that the ALJ adequately explained that Halas' opinion was inconsistent with his findings that Lovejoy had good insight and judgment, an above average cognitive level, concrete thinking, no confusion, and good concentration. *Id.* Furthermore, the Commissioner asserts that Halas' opinion was inconsistent with: (1) Lovejoy's minimal mental health treatment; (2) a third-party function report stating that Lovejoy saw friends occasionally, had no problems getting along with others, went out to eat, saw movies, and shopped several times per month; and (3) Dr. Sunshine's notes that Lovejoy denied any depression or anxiety. *Id.* at 796. Moreover, the Commissioner contends that the ALJ adequately controlled for Lovejoy's limitations in the RFC determination. *Id.* Finally, the Commissioner argues that the ALJ did not err in giving the state agency consultants' opinions great weight, because their opinions were supported by the objective medical evidence. *Id.* at 796–97.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions). An ALJ may rely on a state agency consultant's opinion, and may give such opinions greater weight than other nontreating physicians' opinions if they are supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015).

The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in evaluating Halas' opinion. Here, the ALJ complied with the regulations by specifically stating that Halas' opinion was due partial weight. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527, 416.927; (Tr. 43). The ALJ also gave adequate reasons for assigning Halas' opinion partial weight by: (1) noting Halas' expertise and examining relationship, and (2) explaining that Halas' opinion was inconsistent with Lovejoy's minimal mental health treatment, unremarkable mental health examination findings, and daily activities. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 43). Furthermore, the ALJ did not err by giving the non-examining state agency consultants' opinions great weight, notwithstanding the partial weight given to Halas' opinion, because the ALJ found that the objective medical

evidence in the record supported the state agency consultants' opinions.  *Reeves*, 618 F. App'x at

274; *Gayheart*, 710 F.3d at 375; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); (Tr. 42–43).

Moreover, substantial evidence supported the ALJ's determination that Halas' opinion was

inconsistent with Halas' examination notes and the other evidence in the record, which showed

that: (1) Halas found that Lovejoy was cooperative, was appropriately motivated, was completely

oriented, had concrete thought, could concentrate, had average or above average cognitive levels,

and had good insight and judgment; (2) Lovejoy had sparse mental health treatment records and

had only begun counseling the day before her ALJ hearing; (3) Lovejoy's treatment mainly

consisted of medication management for seizures every few months; and (4) Lovejoy's treatment

notes regularly indicated that she was alert and oriented, denied depression and anxiety, did not

indicate any significant mental health issues, and only twice acknowledged having memory

problems.  (Tr. 63–65, 541, 543–44, 546–47, 549–50, 552–53, 555–56, 560–61, 566–67, 670–71,

694–95, 698–99).  Thus, even if evidence could support a different result, the ALJ's decision to

give Halas' opinion partial weight falls within the Commissioner's 'zone of choice" because it

was reasonably drawn from the record.  *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*,

800 F.3d at 545.

## VI.     Conclusion

Because the ALJ failed to apply proper legal standards in evaluating Dr. Sunshine's opinion and the opinion from LCDJFS, the Commissioner's final decision denying Lovejoy's applications for disability insurance benefits and supplemental security income is VACATED and the matter is REMANDED for further proceedings consistent with this memorandum of opinion and order.

IT IS SO ORDERED.

Dated: January 30, 2019

Thomas M. Parker
United States Magistrate Judge